## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **JOSEPH FRANKLIN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:00-CV-1465 (CEJ)** |
| | ) | |
| **AL LUEBBERS,** | ) | **This is a capital case** |
| | ) | |
| **Respondent.** | ) | **Execution scheduled Nov. 20, 2013** |

### MOTION FOR STAY OF EXECUTION PENDING
### SUPPLEMENTAL PETITION FOR WRIT OF HABEAS CORPUS

Psychiatrist Dorothy O. Lewis, M.D., states not only that Joseph Franklin is a paranoid schizophrenic, but also that Mr. Franklin's condition has substantially worsened since the time she evaluated his competence at trial and for purposes of direct appeal. Ex. 1 (Lewis Report of Nov. 13, 2013), at 3. Mr. Franklin's disease "has likely progressed to the point that he is not capable of making a rational connection between his crime and his sentence of death," and indeed, he believes he is a Christ figure who is "destined to be executed" for his quasi-deific status rather than a murder. *Id.* Petitioner's deterioration since his 1997 trial is borne out by his mental health, medical, and other correctional records maintained by the State itself. Psychiatric records from March through August of 2012, for example, diagnose Mr. Franklin with "severe paranoid and delusional thinking without insight," "poor reality testing," and an "increase in delusional thinking." Ex. 3 (MDOC Mental Health History), at 101, 103,109.

Mr. Franklin, then, has made a "substantial threshold showing of insanity." *Panetti v. Quarterman*, 551 U.S. 930, 949 (2007); *Ford v. Wainwright*, 477 U.S. 399, 426 (1986). That showing entitles Mr. Franklin to a stay of execution as well as the opportunity to prove his claim through evidence. *Panetti*, 551 U.S. at 949-52.

## I.      FACTUAL AND PROCEDURAL HISTORY

Mr. Franklin grew up in a family devastated by extreme violence, mental illness, and poverty.[1] From a young age, Mr. Franklin was the target of his parents' unpredictable wrath. Ex. 2 (Sheffield Aff.) ¶¶ 11, 13, 29. Mr. Franklin's mother and father whipped him with whatever weapon they could put their hands on and frequently did not stop until he was bleeding. *Id.* ¶¶ 14, 15. His parents beat him so severely and so often that his wounds were regularly re-opened without time to heal. *Id.* ¶ 15. On one occasion, when Mr. Franklin was just a boy, he accidentally spilled the entire contents of a salt shaker into his plate of lima beans. *Id.* ¶ 14. His mother forced him to eat the entire plate as he was gagging and crying, then slapped him in the face, pulled his hair out by the handful, and shoved his face into the beans so hard that his mouth was bleeding. *Id.* Finally, she forced him to finish eating the beans, blood and all. *Id.*

As a child, Mr. Franklin was very quiet and kept to himself, playing alone with plastic army men—one of the few toys he had. *Id.* ¶ 29. Mr. Franklin's family was so

---

[1] Maltreatment during childhood is associated with the later development of schizophrenia and other severe mental illness. *See* Lindsay S. Schenkel et al., "Histories of Childhood Maltreatment in Schizophrenia: Relationships with Premorbid Functioning, Symptomatology, and Cognitive Deficits," 76 Schizophrenia Res. 273, 281, 283 (2005).

poor that, at one point, they lived in the former mechanic shop of an abandoned gas station, with no furniture but the mattresses they slept on. *Id.* ¶ 7. Mr. Franklin and his siblings often ate food that others threw out as his father spent his meager disability check on liquor. *Id.* ¶¶ 11, 13. In the winter, the children went without shoes or winter coats. *Id.* ¶ 12.

It was in this environment that Mr. Franklin began to demonstrate obsessions and compulsions at a young age. Mr. Franklin was obsessed with cleanliness, washed his hands constantly, and could not tolerate germs or dirt. *Id.* ¶ 30. When Mr. Franklin was 14 years old, he began to hear voices. Ex. 3 (MDOC Mental Health History) at 22-23 (note of Dec. 10, 2007). Joseph reported that, for a long time, it was a female voice speaking to him, but later he heard a male voice telling him, "Wrong." *Id.* That voice persists to this day. Ex. 4 (Sutton Declaration) ¶ 29.

When Mr. Franklin was a teenager, he became obsessed with religion. *See* Ex. 2 (Sheffield Aff.) ¶ 31; Ex. 1 (Lewis Report of Nov. 13, 2013) at 1; Ex. 5 (Lewis Report of March 29, 2002) at 1. Around the same time, Mr. Franklin began to be tortured by what he calls "blasphemous thoughts." Ex. 1 (Lewis Report of Nov. 13, 2013) at 1; Ex. 5 (Lewis Report of March 29, 2002) at 1; Ex. 3 (MDOC Mental Health History) at 33 (note of June 2, 2008). Mr. Franklin carried his Bible with him everywhere, and he began to visit every church in town, regardless of the denomination. Ex. 2 (Sheffield Aff.) ¶ 31. He used to comb through the phone book and attend every church listed. *Id.* Mr. Franklin's obsession with religion has persisted throughout his adult life and progressed to the point

3

that he believes he is leading a life parallel to that of Christ and receives command orders and visions from God. Ex. 3 (MDOC Mental Health History) at 104-105 (note of May 21, 2012); Ex. 6 (Lewis Report of Nov. 13, 1996) at 3; Ex. 4 (Sutton Declaration) ¶¶ 32, 35, 37.

Many of Mr. Franklin's family members also have severe mental illnesses as well as chromosomal abnormalities. Hospital and social security records for Mr. Franklin's father, James, demonstrate that James was delusional, believed people "were out to get him," and "avoid[ed] crowds, strangers, and noise." Ex. 5 (Lewis Report of March 29, 2002) at 2. James had also been on a locked psychiatric ward, and records report that "[m]any of his statements bordered on hallucinations" that seem "to be the fantasies of a disordered mind." *Id.* Records also note "confusion, memory impairment, looseness of associations and inappropriateness." *Id.* In her 2002 report, Dr. Dorothy Lewis noted that these symptoms of persecutory delusions, hallucinations, loose associations and inappropriateness are characteristic of paranoid schizophrenia, which is heritable. *Id.*

Mr. Franklin's brother has been diagnosed with schizophrenia and has been psychiatrically hospitalized on numerous occasions. Ex. 1 (Lewis Report of Nov. 13, 2013) at 2. Gordon believes that a tracking device was implanted in his brain during one of these hospitalizations. *Id.* He also believes that he is a werewolf and can run 400 miles per hour to save people from vampires. *Id.*; *see also* Ex. 2 (Sheffield Aff.) ¶ 37. At one point, Gordon was living with his sister Carolyn, but she evicted him upon learning that Gordon was hearing voices directing him to kill Carolyn's husband. *Id.* Until recently,

Gordon was living in an adult group home where he received medication and treatment for his mental illness. *Id.* Within the past year, however, Gordon has wandered aimlessly to different states and, when arrested by police, is unaware of who he is, where he is, or how he got there. *Id.* Gordon even wandered to Missouri, likely looking for his brother Mr. Franklin, and was psychiatrically hospitalized while there. *Id.* ¶ 40.

Meanwhile, Mr. Franklin left home at 17-years-old and began to lead a nomadic existence, moving from town to town all across the United States and affiliating himself with the Nazi Party and Ku Klux Klan. Ex. 1 (Lewis Report of Nov. 13, 2013) at 1; Ex. 2 (Sheffield Affidavit) ¶ 32. During this time, Mr. Franklin continued to have visual and auditory hallucinations, bizarre delusions, and idiosyncratic beliefs, which frequently directed his behaviors and caused him to commit self-destructive acts and violent acts toward others. Ex. 1 (Lewis Report of Nov. 13, 2013) at 1; Ex. 6 (Lewis Report of Nov. 13, 1996) at 6. Indeed, Mr. Franklin believed that he received messages from God to shoot and kill black and Jewish people to start a massive race war in the United States. *Id.* During his "mission," as Mr. Franklin calls it, he believes that he received messages from God through dreams and he "knew instinctively to obey whatever the dreams told me." Ex. 4 (Sutton Declaration) ¶ 34.

While serving six consecutive life sentences at the federal penitentiary in Marion, Illinois, Mr. Franklin contacted the FBI on his own accord and confessed to fatally shooting Gerald Gordon and non-fatally shooting two other worshippers outside of a synagogue in Richmond Heights, Missouri. *Franklin v. Leubbers*, 494 F.3d 744, 745 (8th

Cir. 2007). Mr. Franklin believes that God sent him messages in dreams that told him to confess to this crime and to be executed. Ex. 4 (Sutton Declaration) ¶ 34; Ex. 6 (Lewis Report of November 13, 1996) at 3. After his confession, Mr. Franklin was charged with capital murder and two counts of felonious assault and tried in Missouri state court.

Two months before the trial, Mr. Franklin moved to waive his right to counsel and proceed to trial *pro se*. *Franklin v. State*, 24 S.W.3d 686, 690 (Mo. banc 2000). The court subsequently held a competency hearing. *Id.* Prior to the hearing, Mr. Franklin was evaluated by Dr. Lewis, who concluded that Mr. Franklin was unable to assist his attorneys in his defense because he suffered from paranoid schizophrenia. *Id.*

In her competency evaluation, Dr. Lewis reported that Mr. Franklin was "psychotic, his thinking delusional and confused, and that at this time he is not competent to stand trial." Ex. 6 (Lewis Report of Nov. 13, 1996) at 1. Indeed, Dr. Lewis was asked to evaluate Mr. Franklin because he had rejected defense counsel's initial expert because that psychiatrist's name began with a "D," which Mr. Franklin explained was the fourth letter of the alphabet and four is "a bad number." *Id.* at 1-2. Additionally, the initial psychiatrist's name, Dr. Dinwiddie, contained the word "die," which Mr. Franklin believed was very dangerous. *Id.* at 2.

Dr. Lewis also explained that Mr. Franklin seriously considered firing his trial lawyers because they might save his life. *Id.* at 3. Dr. Lewis described that "from the outset Mr. Franklin has been working at odds with his attorneys," engaging in self-destructive behaviors and refusing to follow his attorneys' advice. *Id.* So extreme are Mr.

Franklin's delusions that, at the time of the evaluation, Mr. Franklin had made numerous attempts to have himself surgically castrated, believing that such action was necessary to save him from the "hellfire" punishment for his previous inter-ethnic and inter-racial sexual relationships. *Id.* at 6. In fact, in 1986 Mr. Franklin went on a hunger strike until the prison agreed to allow him to consult a doctor regarding castration. *Id.* at 8.

Even the court-appointed psychologist, Dr. S.D. Parwatikar, diagnosed Mr. Franklin with paranoid personality disorder and acknowledged that he exhibited idiosyncratic thinking and bizarre beliefs. *Franklin v. State*, 24 S.W.3d 686, 690 (Mo. banc). Dr. Parwatikar granted that Mr. Franklin believed that spirit guides spoke to and guided him in life decisions, that Jews were the cause of all evil, and that the government, media, and film industry were the "great Satan." *Id.* Mr. Franklin even described his belief that he must be castrated to the trial court in his own testimony, during which he was trying to appear sane. Ex. 5 (Lewis Report of March 29, 2002) at 3.

Despite Mr. Franklin's psychosis and delusional belief system, the circuit court found him competent to stand trial and represent himself. *Id.* At trial, Mr. Franklin made no opening argument and presented no evidence. *Franklin v. State*, 24 S.W.3d at 689. At one point, Mr. Franklin said to the prosecutors, "You two are working for me, not them." Ex. 5 (Lewis Report of March 29, 2002) at 4. During closing arguments, Mr. Franklin urged the jury to sentence him to death, stating that he would kill someone else if the jury did not vote for the death penalty. *Franklin v. Leubbers*, 494 F.3d 744, 747 (8th Cir.

2007). The jury found Mr. Franklin guilty of all three charges, and recommended a sentence of death for capital murder. *Id.*

At the time of sentencing, Mr. Franklin waived his direct appeal. *Id*. Despite his waiver, Mr. Franklin's advisory counsel presented Mr. Franklin with an authorization to file an appeal, which he refused to sign. *Id.* at 747-748. Mr. Franklin's advisory counsel nonetheless filed the unauthorized notice of appeal. *Id.* at 748. The Missouri Supreme Court ordered Mr. Franklin to submit in writing his intention regarding his appeal, and Mr. Franklin again asserted that he did not wish to appeal and requested that the court set an execution date. *Id.* The Missouri Supreme Court thus dismissed Mr. Franklin's appeal and conducted only the statutorily required proportionality review, holding that Mr. Franklin's death penalty was "neither excessive nor disproportionate." *State v. Franklin*, 969 S.W.2d 743, 76 (Mo. banc 1998). Two months later, Mr. Franklin stated that he had "changed his mind" and moved to file an appeal authorization, which the state court denied as untimely.

Mr. Franklin then filed a *pro se* motion for post-conviction relief, presenting several claims of constitutional violations during trial as well as ineffective assistance of appellate counsel. The motion was denied without an evidentiary hearing. The Missouri Supreme Court affirmed the denial on June 27, 2000, holding that Mr. Franklin's competence was fully litigated before the trial court and he had not shown prejudice. *Franklin v. State*, 24 S.W.3d 686, 690-93 (Mo. banc 2000).

Mr. Franklin petitioned this Court for federal habeas relief on September 12, 2000. While that proceeding was pending, Dr. Lewis issued a second psychiatric report discussing Mr. Franklin's competency to waive his appeals. Ex. 5 (Lewis Report of March 29, 2002). Dr. Lewis explained the devastating impact of Mr. Franklin's psychotic delusions on his ability to assist in his defense. *Id.* at 2-5. Dr. Lewis emphasized that "space precludes citing all the evidence of Mr. Franklin's incompetence either to sign a waiver of counsel or to represent himself," *id.* at 3, but gave a number of examples, including:

- Mr. Franklin agreed to meet with Dr. Lewis, a Jewish woman, but he refused to be examined by her colleague and neurologist, Dr. Jonathan Pincus, because he was a Jewish man. *Id.* at 2.

- Mr. Franklin testified that if he were not castrated, he would burn in hell. *Id.* at 3.

- After describing his simultaneous consideration of joining the Nazi Party and a church "known as British Israelism," Mr. Franklin testified, "I believe I am Jewish right now." *Id.*

- Mr. Franklin testified to seeing "dark motions [that are] usually a warning something is bad," whereas "the lighter ones, that's a good sign." *Id.*

- During voir dire, Mr. Franklin said, "I want to make sure there's no one in there who would not—who be opposed on the grounds of the death penalty." *Id.*

- Mr. Franklin requested the appointment of a different attorney, stating, "It doesn't matter if they have had experience in capital cases or not." *Id.* at 4.

- Throughout the trial, Mr. Franklin collaborated with the prosecution. *Id.*

- When Mr. Franklin heard the guilty verdict, "he made a thumbs up sign and said, 'Right on.'" *Id.*

In 2004, this Court granted federal habeas relief to Mr. Franklin on two grounds. *See Franklin v. Roper*, No. 4:00-CV-1465 (CEJ), Memorandum and Order of June15, 2004 (ECF Doc. 92). First, it held that petitioner did not knowingly and voluntarily waive his right to trial counsel. Second, it ruled that Mr. Franklin suffered "plain error" from the trial court's failure to instruct the jury that it must impose a life sentence unless it unanimously found that the aggravating circumstances warranted the death penalty. The Eighth Circuit reversed, holding that Mr. Franklin procedurally defaulted these claims by waiving his direct appeal. *Franklin v. Leubbers*, 494 F.3d 744 (8th Cir. 2007), *cert. denied*, 553 U.S. 1067 (2008).

On August 14, 2013, the Missouri Supreme Court set Mr. Franklin's execution for November 20, 2013. On October 25, 2013, this Court appointed mitigation specialist Jessica Sutton and psychiatrist Dr. Dorothy Lewis for clemency-related and ancillary proceedings. Subsequent investigation has revealed new documentary evidence that, in combination with recent assessments of Mr. Franklin's mental health, demonstrate that Mr. Franklin's mental health has deteriorated since he was sentenced to death, and his delusional belief system dictates a distorted perception of his death sentence.

On November 14, 2013, counsel for Mr. Franklin invoked the procedures of Section 552.060, R.S.Mo., by writing to George Lombardi, the Director of the Department of Corrections. Ex. 7 (Letter to Director of the Department of Corrections). Counsel urged that she has "reasonable cause" to question Mr. Franklin's fitness for execution. *Id.* She asked Mr. Lombardi to provide notice to the Governor so that he could "forthwith order a stay of execution" under the statute. Counsel has not received any oral or written response to this request as of the time of this writing.

On November 18, 2013, Mr. Franklin filed a petition for writ of habeas corpus in the Missouri Supreme Court, asserting there the same *Ford* claim that he now brings in this Court. Mr. Franklin requested a stay of execution and an evidentiary hearing, but, on November 19, 2013, the Missouri Supreme Court summarily denied all relief without explanation or further adversarial proceedings. *See* Ex. 8 (Orders denying habeas relief and stay, dated Nov. 19, 2013). Mr. Franklin now seeks relief from this Court.

## II.    A "substantial threshold showing" of incompetence requires a stay.

*Ford* claims are unique among stay remedies. First, a claim of incompetence to be executed does not ripen until an execution date is near, precisely because the prisoner's mental status may change over the course of time. *Panetti v. Quarterman*, 551 U.S. 930, 934-35, 943 (2007). Second and more importantly, there is no multi-factor test to assess the prisoner's entitlement to a stay, such as the criteria described in *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Rather, due process per se ***requires*** a stay when the prisoner makes a colorable showing of incompetence:

> Once a prisoner seeking a stay of execution has made "a substantial threshold showing of insanity," the protection afforded by procedural due process includes a "fair hearing" in accord with fundamental fairness.

*Panetti*, 551 U.S. at 949, quoting *Ford*, 477 at 426. The Constitution permits only one requirement for a stay, which is a "substantial threshold showing of insanity." *Id.*

The requirement is not onerous. In *Panetti*, for example, the prisoner's "substantial threshold showing" consisted of declarations from a psychologist and law professor who interviewed Mr. Panetti the day before his scheduled execution, as well as broad evidence of "mental dysfunction" from earlier legal proceedings. *See* 551 U.S. at 938, 950. Although *Panetti* and *Ford* do not precisely define the quantum of evidence required, the authorities describe a relatively modest standard. The Texas Court of Criminal Appeals recently held that the prisoner must offer more than merely "some evidence" of incompetence but less than a "preponderance" of the evidence. *See Druery v. State*, No. AP–76833, ___ S.W.3d ___, 2013 WL 5808182, at *14 (Tex. Crim. App. Oct. 30, 2013). The Tennessee Supreme Court observes that the showing is met "by the submission of affidavits, depositions, medical reports, or other credible evidence sufficient to demonstrate **the existence of a genuine question** regarding the prisoner's present competency." *State v. Irick*, 320 S.W.3d 284, 287 (Tenn. 2010) (emphasis added). The authorities agree that a court may not weigh the prisoner's evidence against contrary evidence from the State when determining the existence of a "substantial threshold showing." *See Druery*, 2013 WL 5808182, at *15; *Provenzano v. State*, 751 So.2d 37, 40 (Fla. 1999). Conflicting evidence instead requires further proceedings, including a

12

hearing. *Provenanzo*, 751 So.2d at 40.

### III. Petitioner demonstrates a "substantial threshold showing" that he is incompetent to be executed.

Mr. Franklin is incompetent to be executed under *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Panetti v. Quarterman*, 551 U.S 930, 946 (2007). Under *Ford*, the State may not execute a prisoner who is insane. The Eighth Amendment forbids the execution of prisoners "who are unaware of the punishment they are about to suffer and why they are to suffer it." 477 U.S. at 422 (opinion of Powell, J.). "[O]nce a prisoner makes the requisite preliminary showing that his current mental state would bar his execution, the Eighth Amendment, applicable to the States under the Due Process Clause of the Fourteenth Amendment, entitles him to an adjudication to determine his condition." *Panetti*, 551 U.S. at 934-35; *Ford*, 477 U.S. at 418.

Mr. Franklin does not possess a rational understanding of the purpose and implications of his sentence because he is a paranoid schizophrenic who has been suffering for nearly fifty years from severe psychosis, including delusions and hallucinations that shape Mr. Franklin's perception of life, death, and punishment. In addition to Mr. Franklin's long-standing and documented history of mental illness, his deteriorating mental health and current mental state have so distorted his reality that he cannot place his execution in any realistic context. Consequently, the State is prohibited from executing Mr. Franklin on Wednesday, November 20, 2013.

### A. Mr. Franklin's current mental state shows that he has a delusional understanding about the purpose of his impending execution, and that he

**believes its true purpose is to punish him for his Christ-like status rather than for a 1977 homicide in St. Louis County.**

Mr. Franklin's psychosis "put[s] an awareness of a link between [Mr. Franklin's crime] and its punishment in a context so far removed from reality that the punishment can serve no proper purpose." *Panetti*, 551 U.S. at 960. In a report dated November 13, 2013, Dr. Lewis discussed her review of new evidence concerning Mr. Franklin's current mental state, concluding that "Mr. Franklin's disease has likely progressed to the point that he is not capable of making a rational connection between his crime and his sentence of death, nor is he able to assist counsel or understand matters in extenuation of his punishment of death." Ex. 1 (Lewis Report of Nov. 13, 2013) at 1.

Mr. Franklin understands his death sentence within the context of his delusional belief system: his life parallels that of Christ and, like Christ, it is his destiny to be executed by the State. *Id.* In May 2012, Mr. Franklin explained to a prison psychiatrist that his "mission," or the three years in which he was engaged in criminal behavior, "lasted three years in the same way that Jesus' ministry lasted three years." Ex. 3 at 104-05. In a series of interviews conducted over the past week, Mr. Franklin has continued to express these hallucinations and delusions, stating that he, like Christ, has psychic powers and extra-sensory perceptions. Ex. 4 (Sutton Declaration) ¶ 37. Mr. Franklin stated that the Lord had the ability to read the mind of his enemies, and God has sent Mr. Franklin a message that he would "one day be more psychic than all the psychics." *Id.*

14

Mr. Franklin describes frequently receiving messages from God through dreams, visions, numerology, and revelations. Over the past week, Mr. Franklin has expressed his belief that God has been sending him messages about his upcoming execution in dreams. *Id.* ¶ 35. Mr. Franklin stated that God has told him that "whether or not he will be executed on Wednesday depends solely on his conduct in these final days, and if he has good conduct, he will not be executed." *Id.* Mr. Franklin believes that his conduct can "change the course of history." *Id.*

On November, 8, 2013, God sent Mr. Franklin a message that one of the surviving victims from the shooting in Salt Lake City was his daughter in a previous reincarnation. *Id.* ¶ 36. Mr. Franklin believes that he shares a strong connection with this individual. *Id.* These messages from God also command Mr. Franklin to do things. Mr. Franklin explained that he received a message from God in a dream that told him to confess to the shooting in Richmond Heights, Missouri. *Id.* ¶ 34. The messages in his dreams, Mr. Franklin explained, tell him to do many things, big and small, such as "change his hair color or buy different eyeglasses." *Id.*

Mr. Franklin's delusional thinking and psychosis also dictate his beliefs about death. Recently, Mr. Franklin explained that he was unable to call or mail documents to the office of a defense team member because her organization is titled the "Death Penalty Litigation Clinic." *Id.* ¶ 40. Mr. Franklin believes that the word "death" and "die" must never be spoken aloud or else it could put a hex on whoever says the word, causing them to die. *Id.* As Mr. Franklin's execution date approaches, he is avoiding the words "death"

15

and "die" because he believes that will affect whether or not he is executed. *Id.* Similarly,

Mr. Franklin is avoiding the number eight, which he believes is the number of death, as

well as the number "between 31 and 33," which is "the worst number and cannot be

spoken aloud." *Id.* ¶ 39. Again, Mr. Franklin is convinced that association with these

numbers could affect his execution. *Id.*

Mr. Franklin also has documented issues with "reality testing," or the ability to

distinguish between the external world and one's own mind. *See* Ex. 3 (MDOC Mental

Health Records), at 103. On November 12, 2013, Mr. Franklin described "the world in

which everyone lives as an 'illusion' in the most literal sense of the word." Ex. 4 (Sutton

Dec.) ¶ 11. Mr. Franklin elaborated that "nothing we see is real because 'God can give

you delusions and plant lies in your head to punish you.'" *Id.*

Some of Mr. Franklin's hallucinations are recurrent; in particular, Mr. Franklin has

had regular hallucinations about flies. Mr. Franklin first saw a cloud of flies materialize

from the wood of his table while he was in the federal penitentiary. *Id.* ¶ 28. Mr. Franklin

has seen these flies again during his incarceration at the Potosi Correctional Center, and

even more frequently the past two years. *Id.* Mr. Franklin kills these flies with his hand

and explained that the flies in federal prison were filled with blood, whereas the flies at

Potosi were filled with dry blood. *Id.*

These visual and auditory hallucinations sometimes command Mr. Franklin's

behavior. For years, Mr. Franklin heard a female voice in his right ear that told him "No"

when he was about to do something. *Id.* ¶ 29. About a year ago, the voice stopped, and

16

Mr. Franklin expressed sadness at the loss because the voice had meant a lot to him. *Id.*
Since Mr. Franklin moved to the Eastern Regional Diagnostic and Correctional Center in
Bonne Terre, the voice has returned, but it now sounds mechanical. *Id.*

Mr. Franklin's delusional beliefs and hallucinations prevent a rational
understanding of his execution and its purpose. Mr. Franklin's world is built upon
delusions that he is destined to be executed by the State because of the parallels between
Christ and himself. His actions are determined by messages, revelations, dreams, and
voices from God. One of these recent messages has told Mr. Franklin that whether or not
he will be executed depends solely on his conduct in the days leading up to his execution.
Mr. Franklin's visual and auditory hallucinations also shape his concept of life and death.
He is unable to distinguish between external reality and his own internal world, and he
therefore cannot conceive of his punishment and its consequences outside of his own
delusional framework. Even the prison's psychologist states that Mr. Franklin is "very
suspicious about everything and he incorporates everything that happens into his
delusional system." Ex. 3 (MDOC Mental Health Records), at 44. Given Mr. Franklin's
current condition, Dr. Lewis concluded that "there are reasonable grounds to believe that
Mr. Franklin presently lacks the capacity to understand that he is to be executed because
of a conviction for murder." Ex. 1 (Lewis Report of Nov. 13, 2013) at 3.

The State will likely point to what is, at most, Mr. Franklin's surface-level
"awareness" of his crime and the fact of an approaching execution, such as the fact that
Mr. Franklin often discusses "death" and possible ways to avoid it. But Mr. Franklin's

17

beliefs are not mere "superstitions" as respondent has urged. Mr. Franklin avoids the word "death," for example, because he delusionally believes that speaking the word aloud may put a hex on the speaker, causing him or her to die. He thus declined to cooperate with the mitigation specialist because he believed that her employment at the Death Penalty Litigation Clinic was a sign from God. *See* Ex. 4 (Sutton Dec.) ¶ 40. The fact that Mr. Franklin thinks and speaks about the topic of "death" does not mean that he rationally understands why he faces death or even how death is caused.

Mr. Franklin is incompetent under the reasoning of *Panetti*, which holds that a court must consider a prisoner's delusional beliefs about his crime and punishment when determining whether the prisoner rationally understands the connection between the two. *Panetti*, 551 U.S. 959. "A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Id.* Even the prison's psychologist states that Mr. Franklin is "very suspicious about everything and he incorporates everything that happens into his delusional system." Ex. 3 (MDOC mental health records), at 44. Like Scott Panetti, Mr. Franklin appears to understand the government's stated reason for his execution, but he believes the stated reason is not the real reason: Mr. Franklin faces execution, he maintains, because of his Christ-like status or "destiny" rather than for a murder committed in St. Louis County. *See* Ex. 1 at 1, 3.

**B.    The State's own records demonstrate that Mr. Franklin's mental health has deteriorated since the time of trial. Therefore, the fact that Mr. Franklin was found competent for trial in 1997 does not establish that he is competent for execution in 2013.**

Petitioner expects the State to argue, as it did before the Missouri Supreme Court, that Mr. Franklin's showing of incompetence is no different now from the time of trial, and that it reflects the petitioner-friendly and filtered observations of Mr. Franklin's attorneys and mitigation specialist. But that is manifestly untrue. The State's own prison records show that Mr. Franklin has deteriorated over the course of years, that he exhibits delusional and bizarre behavioral patterns, and that he has been diagnosed as psychotic and delusional by the prison's own mental health professionals. In 2008, for example, Mr. Franklin told a psychologist at prison that he will not be put to death because God will save him from that sanction, and he explained that he refused an earlier evaluation with Dr. Lewis because "I had a dream and God sent me a message that I should not talk to that psychiatrist." Ex. 9 (note of October 20, 2008). The same prison psychologist had earlier diagnosed Mr. Franklin with obsessive compulsive disorder and psychosis. Ex. 10 (note of December 10, 2007). Mr. Franklin has frequent delusions about homosexuality and Satanism among prison staff, including a report that male staff members were staring at his penis. He sees ghosts and blood-filled flies in his cell, covers his floor and bed with newspapers, shows "ongoing symptoms of paranoia," and was once observed to be "going nuts" and "foaming at the mouth." Ex. 6 (Sutton Declaration), at 45-47, and MDOC sources cited.

Psychiatric notes report that Mr. Franklin "appears to have delusional thinking" (Ex. 3 (MDOC mental health records), at 25); that he is "very paranoid with

some delusions" (*Id.* at 41); that he is "very paranoid and delusional" (*Id.* at 44); that he appears "disheveled," exhibits "rambling" speech, and is "paranoid and delusional" (*Id.* at 53); the he suffers from psychosis (*Id.* at 55); that his "thinking patterns are disorganized" and include "delusional content" (*Id.* at 98); and that his thoughts are "paranoid and delusional" and his insights and judgment "very poor" (*Id.* at 101).

More recent psychiatric reports show even further decline. On March 16, 2012, Mr. Franklin was diagnosed with "severe paranoid and delusional ideation without insight." *Id.* at 101. On June 4, 2012, Mr. Franklin was described as having "poor reality testing," which is to say, a poor ability to distinguish fantasy from reality. *Id.* at 103. And on August 27, 2012, a record documents an "increase in delusional thinking." *Id.* at 109.

Additional medical records from the Department of Corrections, as well as Mr. Franklin's classification file, became available to counsel only days ago, and they similarly document Mr. Franklin's declining mental state after the time of his conviction and sentence:

• On April 19, 2004, Mr. Franklin believed that staff at U.S.P.-Marion have "decided it would be best to recruit him, and send him over here to target me, like intelligence services like the KGB recruit double agents, or agents-in-place." Ex. 11 (Classification File), at 2-3.

•On August 10, 2004, Mr. Franklin saw the nurse and stated that his "spirit guide" told him not to let the doctor touch him. Ex. 12 (Excerpted Medical Records), at 12-13.

•On August 19, 2004, Mr. Franklin submitted a medical services request for

"attacks by Satan." Ex. 12 at 3.

•On December 8, 2005, Mr. Franklin requested Superintendent Donald Roper to investigate "a scheme masterminded by a homosexual at Bonne Terre who used to work here to have me transferred to Bonne Terre by bisexual/homosexual officers." Ex. 11 at 9.

•On March 9, 2007, Mr. Franklin claimed that he is the "Joseph of many colors in the Bible reincarnated." Ex. 12 at 14-15.

•On June 12, 2007, the Missouri Department of Corrections held a hearing regarding protective custody for Mr. Franklin, where Mr. Franklin stated that he "got a sign from God" and felt that his life was in danger. Ex. 11 at 14.

•On August 31, 2007, Mr. Franklin stated "I dreamed I had worms, so thats [sic] why I fill out MSR [medical services request], my dreams usually comes [sic] true so do the math." Ex. 12 at 16.

•On October 30, 2007, Mr. Franklin wrote a letter to a nurse reporting that "it appears as if a hole is forming in my skull," and that when he turns in an IRR, he is directed to talk to mental health. Mr. Franklin added that he "refused to go to medical that day . . . because of a black aura I observed in front of the guard, a sign of danger from my spirit guide." Ex. 12 at 19-21.

•On December 11, 2007, Mr. Franklin submitted a medical request stating that he hears a female voice that tells him "No" and a male voice that tells him "wrong". He described his lucky numbers as 5, 3, and 7. Ex. 12 at 4.

•On December 27, 2007, Mr. Franklin wrote to Superintendent Roper that he

believed "the Missouri DOC has been infiltrated by a secret organization of homosexuals." Ex. 11 at 12.

•On March 1, 2010, Mr. Franklin saw the nurse and stated, "They aren't helping. Besides the days are wrong for the Bible." Ex 12 at 17.

•On May 31, 2011, Mr. Franklin submitted a medical services request on which he wrote, "I seek the protection of Allah from the accursed Satan.' --Quran 16:98." Ex. 12 at 5.

•On July 9, 2011, Mr. Franklin told a nurse, "What do you think about this talk about the end of the world coming on December 21, 2012? I got a message from Jesus and he says it's going to happen." Ex. 12 at 18.

Reports from non-correctional sources further document the recent decline in Mr. Franklin's mental health. Petitioner's daughter, Lori Cooper, explains that her father has been "going crazy" and "losing his mind" on death row, where he has spent most of his years in solitary confinement. Ex. 13 (Cooper Aff.) ¶ 20. Ms. Cooper points to her father's letters over the past few years, in which Mr. Franklin often discusses "bizarre interests and beliefs"; Mr. Franklin has become "obsessed with numbers and names" as being either lucky or unlucky, and he has become increasingly paranoid and moody. *Id.* ¶¶ 10, 12-25. Mr. Franklin's obsession with numbers has become so extreme that he will only allow his sister, Carol Sheffield, to visit when the numbers permit it. Ex. 2 (Sheffield Aff.) ¶ 50. Among other strange beliefs, Mr. Franklin opines that the Clean Water Act is a governmental conspiracy to "make it impossible for anybody to buy or sell without the

22

mark of the Beast." Ex. 13 ¶ 22. Petitioner has made similar statements to mitigation specialist Jessica Sutton concerning numbers, names, divine visions, and otherwise. Ex. 4 (Sutton Declaration) ¶¶ 30, 35-41. He explained that God has told him that he will either be executed or not executed depending solely on whether his conduct is "good" during the final days leading up to November 20, and that his own conduct during those days can "change the course of history." *Id.* ¶ 35.

**C.     Petitioner's substantial history of mental illness supports his showing of incompetence.**

As did Scott Panetti, Mr. Franklin has a substantial history of mental illness. Petitioner has experienced hallucinations since his teenage years. Ex. 1 at 1. The otherwise conflicting experts from trial ***both*** diagnosed Mr. Franklin with a mental illness. Dr. Lewis concluded that he suffered from paranoid schizophrenia and was incompetent for trial. *See Franklin v. State*, 24 S.W.3d 686, 690 (Mo. banc 2000). But even the court's chosen expert, Dr. S.D. Parwatikar, diagnosed Mr. Franklin with paranoid personality disorder and acknowledged Mr. Franklin's strange beliefs about Jews, spirit guides, the government, and mass media. *Id.* Paranoid personality disorder is known to predispose a person to psychotic disorders such as schizophrenia. *See* "Internet Mental Health: Schizophrenia", available at <<www.mentalhealth.com/dis/p20-ps01.html>> (noting that "schizotypal, schizoid, or paranoid personality disorder may sometimes precede the onset of schizophrenia").

The State will likely argue that Mr. Franklin was found competent to represent

himself at trial and waive his direct appeal, and that "a finding of competence, once made, continues to be presumptively correct until some good reason to doubt it is presented." *Franklin v. Luebbers*, 494 F.3d 744, 749 (8th Cir. 2007). But that simply means that (a) the burden of proof is on Mr. Franklin, (b) he, like every other *Ford* claimant, was found competent to proceed for trial before he was sentenced to death, and (c) he must now present new evidence of his current mental state concerning whether he rationally understands his impending execution and its purpose. Petitioner has presented abundant such evidence, and amply enough to make a "significant threshold showing" to justify a stay of execution and plenary adjudication of his claim. *Panetti v. Quarterman*, 551 U.S. 930, 949 (2007); *Ford v. Wainwright*, 477 U.S. 399, 426 (1986). "Prior findings of competency do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition." *Panetti*, 551 U.S. at 934.

**D.     Petitioner has not unduly delayed the litigation of his claim, the development of which has been hampered by Mr. Franklin's delusions.**

This claim is not unnecessarily delayed. On account of Mr. Franklin's psychosis, he has been unable to work with his defense counsel in the months leading up to the execution. Upon first learning of the October 25 appointment of mitigation specialist Jessica Sutton, Mr. Franklin refused to call or otherwise contact her due to his strongly negative numerological readings of Ms. Sutton's office phone number. Ex. 4 (Sutton Dec.) ¶ 23. In order to communicate with Mr. Franklin, Ms. Sutton agreed to give Mr. Franklin her work cell phone number, which he believed to be a more neutral number. *Id.*

Ms. Sutton has also had to assuage Mr. Franklin's concern about her working on the Sabbath. *Id.* ¶ 42.

For weeks, and until seven days ago, Mr. Franklin refused to execute a release for his Department of Corrections records, which contain crucial information to determining the progression of his mental illness and current state of mind, again because the "numbers" in the address did not permit it. *Id.* ¶¶ 15, 23; Ex. 1 (Lewis Report) at 1. Mr. Franklin will also not place or accept calls on certain days depending on his readings of the numerological messages. Ex. 4 ¶¶ 16, 42; 45. In addition, Mr. Franklin refused to call or write to the office of the mitigation specialist because the organization is named the Death Penalty Litigation Clinic, and Mr. Franklin believes that saying the word "death" could place a hex on him and affect his own life. *Id.* ¶ 40. On November 13, 2013, counsel scheduled a call between the mitigation specialist, Dr. Lewis, and Mr. Franklin, but Mr. Franklin did not call the offices of the Death Penalty Litigation Clinic. *Id.* ¶ 23. Mr. Franklin's delusions have thus materially hampered his defense team from gathering the information needed to assess his current competency.

**E.     Petitioner makes a *prima facie* showing that the Missouri Supreme Court unreasonably applied clearly established federal law.**

Even assuming that the state court's summary ruling was on the merits, a federal court must review the prisoner's claim *de novo* where, as here, the state court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

States." 28 U.S.C. § 2254(d)(1). *See Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007). The clearly established federal law at issue in this case comes from *Ford* and *Panetti*, both of which hold that due process requires a "fair hearing in accord with fundamental fairness" when the prisoner has made a "substantial threshold showing of insanity." *Id.* at 949, quoting *Ford v. Wainwright*,  477 U.S. 399, 424, 426 (1986).

The state court in this case provided no such hearing, adversarial or otherwise. Even though *Ford* does not require trial-level formality, petitioner at least deserved "a constitutionally adequate opportunity to be heard." *Panetti*, 551 U.S. at 952; *accord Thompson v. Bell*, 580 F.3d 423, 435 (6th Cir. 2008) ("As *Panetti* makes clear, the state courts' dismissal of Thompson's petition without conducting an evidentiary hearing was an unreasonable application of *Ford*'s tenets.").

What is more, petitioner was whipsawed from gathering—with aid of a stay of execution—the very evidence that the Staged urged was lacking. The State argued that Dr. Lewis had not evaluated petitioner in years, and that her latest report was unpersuasive because it relied on partisan accounts of Mr. Franklin's conduct from counsel and a mitigation specialist. *See State v. Franklin*, No. SC79735, State's Opposition to Motion for Stay and Petition for Writ of Habeas Corpus (filed Nov. 18, 2013), at 8. Yet, Dr. Lewis made clear that she wished to evaluate Mr. Franklin in person, but that his own mental illness makes him unable to assist in his own defense so that she did not have time to travel to Missouri examine petitioner before the scheduled execution date. Ex. 1, at 1. Mr. Franklin's delusions prevented counsel from timely developing the

evidence needed for a claim—not only an evaluation from Dr. Lewis, but also consultation with the mitigation specialist, and more importantly, a release of prison records that Mr. Franklin authorized only the week before his scheduled execution. Mr. Franklin refused to work with Ms. Sutton because he was afraid of her phone number as well as the word "death" within the name of Ms. Sutton's employer, the Death Penalty Litigation Clinic. Ex. 4 (Sutton Dec.) ¶¶ 15,  23, 40. He likewise failed to call in for a scheduled telephone interview with Dr. Lewis, counsel, and the mitigation specialist. *Id.* ¶ 23. By denying a stay of execution despite petitioner's threshold showing of incompetence, the state court deprived Mr. Franklin of the factual development essential to his claim. Mr. Franklin's evidence was derided for want of a recent evaluation, only for Mr. Franklin to be deprived of that evaluation when the court denied a stay. *Cf. Simon v. Epps*, 463 Fed. Appx. 339, 348 (5th Cir. 2012) ("It is difficult to view the process Simon received as fundamentally fair when the court discounted the one affidavit that Simon was able to obtain for its uncertainty, when that uncertainty was a direct result of the court's refusal to grant an order allowing Dr. Goff to evaluate Simon.").

Neither is it disputable that Mr. Franklin had made the "requisite threshold showing" to entitle him to a stay of execution as well as fundamentally fair procedures to develop and prove the facts. *Panetti*, 551 U.S. at 949, 952. Mr. Franklin's evidence exceeds the "substantial threshold showing" made by Panetti himself. There, the showing consisted of declarations from a psychologist and law professor who interviewed Mr. Panetti the day before his scheduled execution, as well as broad evidence of "mental

dysfunction" from earlier legal proceedings. *See* 551 U.S. at 938, 950. Here, by comparison, (a) a renowned psychiatrist states that Mr. Franklin has probably deteriorated to the point that he cannot rationally understand his sentence, (b) petitioner offers extensive records from the state prison system, showing, among other things, that the State's own psychologists have diagnosed Mr. Franklin as delusional and psychotic, (c) first-hand accounts of Mr. Franklin's behavior and thought processes, from confidants and otherwise, corroborate the decline in his mental health and his growing break from reality, and (d) petitioner documents an extensive history of mental illness. The State complained that petitioner's showing was necessarily weak because he presented it to the Missouri Supreme Court only two days before his scheduled execution. But that fact does not distinguish the case from *Panetti*, in which a law professor and psychologist did not even visit the prisoner until *one* day before his pending execution. *Id.*

Petitioner made the threshold showing described by *Panetti* and *Ford*, but the state court denied him what due process required: the opportunity to develop and prove the evidence supporting his claim. That opportunity now lies with this Court.

WHEREFORE, for the foregoing reasons, petitioner respectfully requests that the Court stay his scheduled execution, conduct an evidentiary hearing and otherwise full adjudication of his claim, grant a writ of habeas corpus, and afford such other and further relief as the Court deems just and proper.

28

Respectfully Submitted,


/s S. Paige Canfield                     /s Jennifer Herndon
S. Paige Canfield, No. MO36777           Jennifer Herndon, No. MO37921
3889 Juniata                             224 Hwy. 67 North, #122
St. Louis, MO 63116                      Florissant, MO 63031
314-664-7635 phone/fax                   314-280-4734
canfieldlaw@yahoo.com                    314-831-5645 fax
                                         jenniferherndon@gmail.com


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded for transmission via Electronic Case Filing (ECF) this 19th day of November, 2013, to Michael J. Spillane and Stephen D. Hawke, Office of the Attorney General, P.O. Box 899, Jefferson City, Missouri 65101.

/s/ Jennifer Herndon
Jennifer Herndon

*Attorney for Petitioner Joseph Franklin*